The next case for argument is 17-1261 U.S. Department of Labor v. Michael Harris Mr. Lamey, when you're prepared, you may proceed. Good morning, Your Honors. I may please the Court. My name is John D. Lamey III. I represent Mr. Harris, the appellant, here today. I'd like to reserve three minutes for rebuttal. This is a very factually intensive case. I'd like to start out with a very brief rendition of the facts to kind of paint the picture. The debtor, Mr. Harris, was the CEO, President, and Chairman of the Board of Fairbolt Woolen Mills, effective 2001. Fairbolt Mills was established in 1865. It is the oldest private company in the state of Minnesota until it ceased operations in 2009. My client held less than .3% of the outstanding common stock of the company. At some point, Fairbolt Mills sponsored a health plan and became the plan administrator. The health plan contracted with health partners, health insurance company, to provide health benefits to its employees. Pursuant to the agreement, every two weeks, the company withheld monies from their employees to be put towards the monthly health care premium. The contract did not require that these funds be segregated into a separate account. Rather, a debit credit entry was entered on the general ledger as funds were received and withheld from the employee paychecks and as the monthly premiums were paid. The debtor's primary duty was to raise capital for this company. He traveled quite a bit. He's kept in touch with the CFO as to what bills needed to be paid and also had the opportunity to weigh in on who got paid what and when. Early January 2009, the company was really under financial pressure. The January health payment was made via a business check, and the debtor and the CFO believed there were adequate funds in the account to pay the January payment. Same situation with February. They mailed a February check, believing there to be funds in the account. As it turned out, both of those checks were returned NSF. Health partners contacted the company and stated that a wire in the amount of roughly $55,000 was needed by March 31st or else the benefits would be terminated. My client, Mr. Harris, reached out to the health plan on March 26th to see if he could get an extension, as he was very worried about being able to wire that amount of money in such a short period of time. On March 27th, the day after my client made the plea to the health partner's rep, the company hired a chief restructuring officer, and on March 27th, the record reflects a board of directors testified that Mr. Harris no longer had any financial control of Fireboat Mills Affairs effective March 27th. Ultimately, on March 31st, the company failed to wire the funds, and the health benefits were canceled, and all the employees went without health insurance. The issue today, Your Honor, is whether or not my client, the debt owed to the Department of Labor should be accepted from discharge under 523A4, and that's a two-prong test. The first prong of 523A4 is a finding has to be made that Mr. Harris was, in fact, a fiduciary, as that term is narrowly defined in the bankruptcy code. Once you find he was a fiduciary, the next necessary prong is to find that he also committed defalcation, and defalcation is not defined in the bankruptcy code, but the recent case of Bullock v. Bank Champagne flushes out what it means to commit defalcation, and essentially the Supreme Court says it's a standard that ultimately rises to the level that's in the penal code. It's almost criminal in nature. First argument with respect to whether or not Mr. Harris was a fiduciary under 523A4, I cite the Court's attention to the Eighth Circuit opinion in 2004, Hunter v. Phillipot. That's a 2004 Eighth Circuit case involving similar facts. There was a principal of a business that was to remit certain union funds to the union, and through the course of business, the principal of that company was unable to pay the union, and there was an argument whether or not he was in fact a fiduciary, and the Hunter court ruled that he was not a fiduciary because the court explained, under 523A4, a technical trust cannot spring from the act from which the debt arose. In other words, the fiduciary relationship must preexist the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring from the act from which the debt arose. In Hunter, the failure to pay the funds, there is no preexisting alleged wrong that was complained of. That is, his failure to hold the money to satisfy the company's contributions doesn't create the fiduciary duty. Any possible trust relationship between the principal and the funds could only have come into existence when he incurred some individual financial liability to the funds. Well, the district court concluded, or as I recollect, essentially made a finding that the debtor, in this case your client, knew the funds were committed to his trust or to the responsibility of the corporation over which he was the head. That he had the financial capacity and ability to make choices about the priority of payment. That I think there was above $70,000 in the account and 55 was owed for the health insurance premiums. And the monies that were set aside specifically to pay those premiums weren't paid but other debts were and the choice was the debtors. Why aren't those facts consistent with the conclusion that he did have a fiduciary responsibility to handle those funds that belonged to employees in a manner that would have provided the promised benefit of health insurance? It's undisputed that he was a fiduciary for a risk of purposes. That was the finding of Judge Nelson in the district court. So we're not arguing that he wasn't an ERISA fiduciary. The argument is, is he the fiduciary under the bankruptcy code, which requires something more than merely being in control of ERISA funds. Well, does that get us to the defalcation question? With respect to the $70,000, the record says that $70,000 worth of bills were paid between May 26th and May 31st. The record doesn't state that maybe some of these checks were written prior to my client's knowledge that he had to wire $55,000. Some of these checks could have been written March 20th, March 25th. There is nothing in the record to suggest that there is available $70,000 without accounting for checks that have already been cut. But that may get us into the defalcation argument, Your Honor. So even assuming he's a fiduciary, that's not enough. He has to have committed defalcation. Well, in creating a priority, putting personal needs or personal preferences above the expectations of the employees and the obligations to maintain their benefits, that seems consistent with the dishonesty required and intent for defalcation, doesn't it? I would argue no, Your Honor. My client had loaned, in the year and a half prior to the incident in question, he had loaned $960,000 of his personal funds from his homestead. He had taken one paycheck in the first quarter of 2009. He had $31,000 in unreimbursed expenses. Had he wanted to prioritize and get his money paid back, he certainly would have done many other things to cause that to happen. He testified in district court, and I'll quote, because I believe it goes to his intent. I have not benefited from the non-remittance of health plan assets. My wife, as I have testified, has a very bad back. She gets therapy. Many doctors have to go to the MAPS clinic to get prescriptions re-administered on a bimonthly basis, I believe. She has other health issues as well. Fortunately, I've not had any significant health issues myself. So the consequence of him causing the health benefits to terminate directly impacted his wife and himself, and he later testifies that they were unable to get insurance until Obamacare was rolled out later that year. So I believe another fact citing to the lack of intent would be that my client, in May of 2009, after the restructuring plan was turned down by the majority shareholder, he insisted that the employees be reimbursed their contributions, but the majority shareholder disagreed and caused the employees not to be reimbursed. So in Bullock, a wrongful intent requires a culpable state of mind involving knowledge of or gross recklessness in respect to the improper nature of the relevant fiduciary behavior. I would submit to the court that this action of not being able to pay the entire $55,000, it was a legal impossibility. My client then chose to have a $1,500 credit card paid. That was his personal credit card. And again, the main mechanism to fund the company had been his HELOC. So there was, I believe, an interest-only payment of $23,000 that was due on his HELOC. The intent there was to keep the HELOC from defaulting so that he could access additional funds if needed. So again, the paying back the HELOC was merely to keep the main funding source of the company alive. And again, this was back in 2008, 2009, when everything was crumbling around them. My client had a $12.5 million line of credit lined up, which was canceled by the bank in early part of March. So again, he believed he was bringing in $12.5 million to keep the company afloat and keep all these employees employed. Unfortunately, it didn't work out that way. So I submit to the court that my client should have this debt discharged under his Chapter 7 filing. Thank you. What is the total amount of discharge that you're seeking? Yes, Your Honor. I believe it's close to $70,000 with prejudgment interest. Yeah, it was 67,839. My notes show before the interest. That sounds right, Your Honor. Thank you. I'll sit down unless the court has any questions. Thank you, Mr. Lamy. Thank you. Mr. Cheverud. May it please the Court. My name is Eric Cheverud. I am here representing the Secretary of Labor on this appeal. Before getting started, I'd like to make two small adjustments to the excellent recitation of facts that opposing counsel just provided. First, the district court did determine that there were over $70,000 worth of assets on March 26th when Mr. Harris called the insurer and learned that it was going to be canceled on March 31st. Second, the district court also determined that he had not lost control of the company on March 27th. He did have control through March 31st. And that is evidenced by his instructions to his CFO to make payments to benefit himself as opposed to remitting the contributions to the insurer. So I would like to take a little bit to talk about specifically what the district court held, the federal district court, because the facts there are really what the facts are for the bankruptcy court decision. So in 2015, a federal district court held after a three-day bench trial that Mr. Harris violated ERISA when he took his employees' money and used those for corporate expenses. The court explained that the employees' contributions to their health care plan, which were withheld from their paychecks, became plan assets under ERISA upon the date of withholding. After making credibility determinations, the court held Mr. Harris was the person at the company who was responsible for remitting those assets, those plan assets, to the health insurer. Indeed, he signed the checks, and he had sole control over who to pay and when to pay them. Thus, Mr. Harris was an ERISA fiduciary to those plan assets beginning in January 2009. Again, this is according to the district court, because he exercised authority and control over those assets. And finally, the court determined that Mr. Harris violated his fiduciary duty of loyalty to those plan assets in late March 2009 when he used them to pay himself and other corporate creditors. Now, that includes direct payments to his personal credit card account, payments to his wife's bank account, and a payment to his home equity line of credit. He did this even though he knew the insurance premiums were due by the end of March, and he knew that he could have just as easily have paid the health insurer what was owed or given his employees their money back. So based on this, the court held him liable under ERISA for the diverted plan assets plus prejudgment interest, which was, as Judge Collison rightly stated, about $67,000. Now, Mr. Harris did not appeal. He instead filed this Chapter 7 bankruptcy petition and listed the ERISA judgment as dischargeable. The secretary filed an adversary proceeding arguing the judgment was nondischargeable because it arose from defalcation while acting in a fiduciary capacity under 11 U.S.C. Section 523.84. For a statute like ERISA to create a fiduciary relationship under Section 523.84, it must establish a trust race and impose trust-like duties on that trust race, and those duties must have preexisted the alleged defalcatory acts. And for defalcation, as opposing counsel rightly noted, the scienter requirement, according to Bullock, is intentionality or gross recklessness. So relying on the facts established during that district court trial, which applied via collateral estoppel, the bankruptcy court held that the withheld employee contributions were a trust race because they were plan assets under ERISA. All ERISA plan assets must be held in trust according to ERISA Section 403. It also held that ERISA imposed fiduciary duties on Mr. Harris to use those monies solely for the benefit of the health plan's participants and beneficiaries, and that those duties, which began at least in January 2009, preexisted his defalcatory acts in late March 2009. Now, finally, the bankruptcy court determined Mr. Harris acted with the requisite scienter necessary to commit defalcation when he, quote, decided, end quote, to use the funds entrusted to him for other purposes, including payments to himself. The bankruptcy court therefore concluded Mr. Harris had acted with conscious disregard to the substantial and unjustifiable risk that his conduct would violate his fiduciary duties, and therefore his ERISA judgment was non-dischargeable. So the bankruptcy appellate court affirmed that decision in a detailed, well-reasoned opinion. It again made a distinction between, as the bankruptcy court did, between cases involving employer contributions, which generally do not create a Section 523A4 fiduciary relationship, and those involving employee contributions, which do. So moving to Mr. Harris's arguments in his brief, we have three involving whether the fiduciary relationship existed. The fourth was whether he acted with requisite scienter. So moving through those, Mr. Harris argues that he was not in ERISA fiduciary until he diverted the employee withholdings for unlawful uses in late March 2009. But this argument flies in the face of what the district court determined factually, which was that he had fiduciary duties under ERISA to a trust race that withheld employee money when they became planned assets. Do you think your position is the district court's findings are dispositive in the bankruptcy? As they apply through collateral estoppel in this instance, yes, Your Honor. I could imagine a case where it would be different, and I think this court has rightly determined in prior cases that applying wholesale in an ERISA analysis to a 523A4 analysis is inappropriate, and there are good reasons for it. But in this case, because these are employee contributions, there's no question as to whether they were planned assets. There's no question as to whether Mr. Harris had trust-like responsibilities to those planned assets, and there's also no question that those responsibilities began in January 2009. The district court has already gone through the evidence, has already gone through a three-day trial, made credibility determinations, and found as much. So the bankruptcy court's job was to take those facts and apply them to the bankruptcy standard of 523A4, and it did so appropriately. Now, on the deep allocation question, I understand you're not arguing estoppel there. Well, there are facts that were established at the district court trial that matter for that analysis. So in late March 2009, he got on the phone, March 26th, with Mr. Harris, got on the phone with the health insurer and asked if he could get an extension of time to make the payment. The insurer said no and asked for payment by March 31st. At that moment, he hangs up the phone. Now he has a choice to make because there's $70,000 in that general operating account, which was the account that they ---- I was just asking about estoppel. Yes. So estoppel would ---- The district court didn't, in the ERISA proceeding, didn't make any finding on deep allocation, as I understand it. Oh, yes. That is entirely accurate, of course. So when you're relying on estoppel, you're relying on it for the proposition that there was a trust, right, and that he was a trustee and so forth. But when it comes to deep allocation, the bankruptcy court made its own independent finding, didn't it? Yes, Your Honor. But again, the facts that were established at the district court trial also all apply through collateral estoppel, and that was agreed to by counsel at the bankruptcy court level. So there are no facts in dispute here because the district court already made those determinations. You mean everybody agreed that findings of fact that were written out by the district court would apply even if they didn't determine an issue in the case? Correct. All right. Correct. And so when it comes to deep allocation as well, what we had was from the district court's findings of fact, Mr. Harris made a choice on March 26th. Who is he going to pay? Is he going to pay the health insurer, or is he going to pay himself and other corporate debts? He chose himself and other corporate debts. That was not his money to use. That's why that's a fundamental basis of what ERISA is. I would like to talk a little bit about Hunter v. Philpott. Now that case is distinguishable in that it involved only employer contributions that were owed via contract. So at the time of that decision, there was an open question in this circuit as to whether employer contributions owed because of an employer's entry into a contract with an employee benefit fund were plan assets once they became due. The lower court's decision in Hunter belies that circumstance, which it stated it quite bluntly, quote, do unpaid employer contributions to an ERISA plan constitute plan assets, end quote. The lower court said yes. This court said no. And from the secretary's perspective, rightly so. It has long been the department's position that, generally speaking, unpaid employer contributions are not plan assets under ERISA. But that is not the same for employee contributions that are withheld from employee paychecks. According to our regulations that have been in place since the 90s, those withheld monies become plan assets once they are reasonably segregable. And this court later adopted that framework explicitly in its decision in Bjorkdal. So in this case, we need not quibble over what reasonably segregable means because the district court already figured that out. It held that the withheld monies became plan assets upon the moment of withholding. And that conclusion, again, applies here via collateral estoppel. So this case is not like Hunter, as Mr. Harris had a duty to protect those plan assets before he decided to divert them. And this accords with the in-circuit bankruptcy court decisions in In Re Gott and in In Re Pottenbaum, as well as the vast majority of out-of-circuit courts that have faced this issue. Moving back to defalcation for a moment, I would like to talk a little bit more about In Re Pottenbaum, in that the way that decision dealt with defalcation is a position that the department disagrees with. There was a debtor who was struggling to pay all of the bills for his company. That included employee withholdings. And the court seemed to suggest that an ERISA fiduciary could decide to use employee contributions for other purposes. There's no exception to the duty of loyalty under ERISA that would allow such activity. This case is much more like the case in In Re Fahy, which we cite in our brief. There, the bankruptcy court concluded a debtor had committed defalcation when he prioritized making payments to corporate creditors, including himself, over his obligation to remit employee contributions to ERISA plans. That decision is correct. It does infer that perhaps violating a duty of loyalty will always constitute defalcation. We are not asserting that here. I think that that might conflict with Bullock a bit. But certainly in this case, what we have is an intentional, or at the least, a reckless disregard for his duties under ERISA. With those comments, Your Honors, are there any questions that I can provide an answer to? I see none. Thank you very much, Your Honors. Thank you, Mr. Chevrud. Mr. Lamy, your rebuttal. Thank you. With regards to Judge Nelson's finding, I'll direct the Court to paragraph 28, and I quote, between March 26 and March 31, 2009, in particular, over $70,000 was either transferred to other Fairboat Mills accounts or was used to pay creditors in expenses, end of quote. So that does not mean that $70,000 was, in fact, available. It doesn't make mention that there might have been transactions before March 26 that were already initiated that would have already had caused part of that $70,000 to already have been spent. So I believe it's an open question if there was, in fact, $70,000 available to pay the health plan. In Ray Pottenbaum, I want to talk about that case because that case involved an employer withholding $2.40 from their union employees' paychecks. And that amount was then used by the company to pay other bills. So same situation here. That company used their union funds that was withheld from their employees to pay other bills. And when the court ultimately determined that the owner did not commit defalcation, the court reasoned as follows. The debtor here was desperately attempting to prioritize his bills in order to eventually pay them all. He did so while communicating about his problems with the union and worked it out to try to fund all his obligations. This is not at all evidence that the debtor acted with a conscious disregard to a substantial and unjustifiable risk that his conduct would violate a fiduciary duty. Why is that so?  Well, the court found that it wasn't a violation or it wasn't defalcation. Certainly there's a risk that the funds dry up and the money cycle dries up. It's always a risk when you're robbing Peter to pay Paul, which I think. . . That's why I wonder why this decision is correct or whether it is correct. I guess. . . I believe the court found that this debtor was doing everything to keep the company afloat and didn't feel. . . There was communication going on there in that case. Weren't there between the. . . He was in communication with the union rep. They're not. . . Employees weren't completely in the dark as with Faribault. These folks had no clue what was happening to their. . . That their premiums weren't being passed on. I don't necessarily know if the union employees knew that, but. . . I would say there was communication between the health plan and Faribault Mills. I believe my time is up. Thank you. Thank you, Mr. Lamy. Court thanks both counsel for your presence and argument before the court this morning. We'll take the case under advisement.